UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MIGUEL TIRADO,

                    Petitioner,                              **DECISION AND ORDER**

          -vs-                                               No. 01-CV-6099

DANIEL A. SENKOWSKI, Superintendent,

                    Respondent.


## INTRODUCTION

Miguel Tirado ("Tirado") filed this *pro se* petition for a writ of habeas corpus pursuant to

28 U.S.C. § 2254 challenging his conviction in Monroe County Court on one count of second

degree murder. The parties have consented to disposition of this matter by the undersigned

pursuant to 28 U.S.C. § 636(b).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Michael Nelson ("Nelson" or "the victim") was fatally shot in the head at about 1:00 a.m.

on July 29, 1993, while he was standing outside a mini-mart at the corner of Seventh and Bay

Streets in the City of Rochester. The two bullets recovered from Nelson's body were found to

have come from the same nine-millimeter gun; however, the murder weapon never was

recovered. At the time of the shooting, no arrests were made.

Months after the murder, Robert Black ("Black"), a convicted drug dealer serving a six to

twelve-year term of imprisonment, informed the City of Rochester Police Department that Tirado

had killed Nelson at the behest of Roberto Concepcion ("Concepcion"). Since Black already was

serving a prison term, the prosecutor informed him that there was not much that could be done in exchange for his cooperation. Black was told that, if he cooperated, the prosecutor would inform the parole board of this fact. The prosecutor also promised Black that if Black filed a collateral application to have his sentence modified, the motion court would be informed of the cooperation he provided. Finally, Black and his sister, Ranisha Mackey ("Mackey"), who also testified for the prosecution, received $800 from the $5,000-award posted by Nelson's father through "CrimeStoppers." Defense counsel was made aware of these facts during the pre-trial phase of the proceeding.

The defendants' severance motions were denied, and Concepion and Tirado were tried jointly in Monroe County Court (Connell, J.). Their first trial ended in a mistrial as a result of juror misconduct. Their second trial commenced on February 7, 1995, before Judge Connell.

At trial, Black testified for the prosecution that he had been driving around with "Seville" (Concepcion), "Base" (Tirado), "Mike" (Miguel Rivera) and "Light" (Rodney Taylor)[1] on the night of the shooting. They saw a black male wearing a white t-shirt and red pants (*i.e.*, Nelson) standing in front of the mini-mart at Bay and Seventh Streets. Black testified that Concepcion commented, "There go [*sic*] the guy that is going to kill him [*sic*]." Black's subsequent testimony clarified that Concepcion meant that he believed Nelson was going to kill him. T.764-66.[2] Concepcion, Tirado and the others returned to Concepcion's house, where they found Mackey and several of their acquaintances.

Black's sister, Ranisha Mackey, testified for the prosecution that she was at Concepcion's

---

[1] Neither Miguel Rivera nor Rodney Taylor testified at trial.

[2] Citations to "T.___" refer to the trial transcript.

house on the night of July 29, 1993, along with "Base" (*i.e.*, Tirado); her brother; "Mike"; and "Light". Mackey testified that Concepcion gave her money to go to the mini-mart to buy a bottle of soda and see who was standing on the corner. When Mackey returned, she told Concepion that she saw a "couple of boys" and described their clothing as "red and black"; at trial, however, she could not recall who was wearing what. Shortly thereafter, Tirado left the house. Mackey testified that Tirado was wearing all black that night: a black hooded sweatshirt, black pants, black boots, and a black coat.

Moments later, Mackey heard "ten or eleven" gunshots coming from the direction of the mini-mart. Soon after that, Tirado returned to Concepion's house carrying a black gun. He went down to the basement and changed his clothes. According to Mackey, Tirado informed Concepion that "he got him." Concepion allegedly told Tirado, "Good job" and commented, "It's one less nigger we got to worry about." T.383.

Black similarly testified that, after Mackey returned from the store and informed Concepcion that a man in a white t-shirt and red pants was standing in front of the mini-mart, Tirado left the house wearing black clothes. Tirado also was carrying a black automatic gun which Black had seen him load. According to Black, as Tirado was leaving, Concepcion told Tirado to "[g]et him all in the head," and commented, "Better him than me." T.773. When Tirado returned, Concepcion asked him if he "got him." Black heard Tirado reply affirmatively and saw him change his clothes and put the gun away. Everyone continued watching television.

Mackey testified that she knew her brother was attempting to obtain a reduction in his sentence by cooperating with the police regarding the Nelson shooting. Mackey, who was a very reluctant witness, stated that she was upset with her brother for getting her involved in the

Tirado/Concepion trial. Defense counsel attempted to impeach her credibility using some of the transcripts of the recorded phone conversations among Mackey, her brother, and the police officers who facilitated Mackey's and Black's testimony. However, Mackey consistently denied that her brother told her what to say and maintained that she did not tailor her testimony in order to corroborate his story.

Three eyewitnesses to the murder testified at trial. Vanessa Peterson ("Peterson") testified for the prosecution that she saw Nelson standing on the corner of Bay and Seventh Streets just prior to the shooting. Peterson saw a man dressed in dark clothes walk up to the victim and begin shooting at him with a dark-colored gun. Peterson was unable to identify the shooter, but recalled that he fired the gun at the victim multiple times and then ran back the way he came. *See* T.570-77. Peterson thought that the shooter was wearing some type of face mask.

Marcia Bernard ("Bernard"), Nelson's cousin, testified for the defense that she lived right across the street from the mini-mart and had been talking to Nelson, from her second-story window prior to the shooting. After they were done talking, Bernard saw Nelson, who was dressed in a white shirt and red pants, talking to a man wearing a baseball cap. Bernard described the man's race as "mixed," stating that he looked like "black and white." Bernard overheard Nelson say, "What you going [*sic*] to do, shoot me?" At that point, the man in the baseball cap pulled out a gun and shot Nelson.

Emma Glen ("Glen") testified for the defense that on the night of July 29, 1993, she heard "a lot" of "rapid" shots fired at about 1 a.m. Glen saw two men (the shooter and someone else) standing over the victim who was lying on the ground. According to Glen, the shooter was black and was wearing "dark blue" clothing and a baseball cap; the other man was black also and had

on a red sweatsuit. Thinking that it was her son who had been shot, Glen started screaming at the two men, who ran down the street and out of view. When Glen originally spoke to the police on the night of the incident, she stated that the shooter had been wearing a blue and white jacket and a baseball cap.

During the last week of trial, an issue arose with respect to another potential defense eyewitness, Sandra Barron ("Barron"), who happened to be Glen's daughter. Barron unexpectedly was rushed to the hospital to receive treatment for blood clots and was unable to appear as scheduled. The trial court granted two adjournments, but the witness was never able to appear in court to testify. The court denied any further adjournments, noting that after almost a week of defense counsel being aware that Barron had health problems, the court had received no verification from the hospital or her doctor as to her condition or her expected date of availability. The judge also noted that Barron apparently had indicated an unwillingness to speak to anyone other than the defense.  Finally, the court determined that, after hearing an offer of proof from defense counsel, Barron's testimony would be cumulative to that provided by Glen.

A significant *Brady*[3] issue developed prior Black's cross-examination when defense counsel brought to the court's attention that he had heard that Black was a prosecution witness in another, unrelated homicide case handled by a different district attorney. Concerned about a possible *Brady* violation, Judge Connell directed the assistant district attorney, Thomas Brilbeck ("ADA Brilbeck") to put on the record what Black was doing for whom. ADA Brilbeck admitted that he learned in late 1993 or early 1994 that Black was testifying for the People in another case,

---

[3] *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that suppression by the prosecution of evidence favorable to the accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution").

but he did not inform the defense. The court adjourned the trial and ordered ADA Brilbeck to provide defense counsel with all of the information he had concerning Black's cooperation in the other case and the consideration which he expected to receive.

Assistant District Attorney Vincent Rizzo ("ADA Rizzo"), the prosecutor in the other murder case in which Black was going to testify for the People, appeared before Judge Connell and informed the court that the only thing he promised Black in August 1994 was that he would inform the motion court of Black's cooperation in the event that Black made an application to have his sentence modified from six to twelve years to four and one-half to nine years. ADA Rizzo noted that there was not much in the way of inducements that could be offered since Black was a sentenced prisoner. ADA Rizzo testified that Black expressed an interest in obtaining a stay of his sentence so that he could be released while his appeal was pending. ADA Rizzo informed the court that, since he did not believe that this was a good idea, he was noncommittal regarding this request and told Black that it was something his defense counsel should explore.

At the court's request, ADA Rizzo turned over his entire trial file in the other court for an *in camera* inspection. After reviewing the file, the court provided any documents that possibly could be considered *Brady* material to the defense. However, the court denied defense counsels' motions for a lengthy continuance, noting that the information provided by the People concerning the other murder trial did not contain any new information with respect to additional promises made to Black in return for his cooperation. The court did order Mackey to be returned from New York City should the defense attorneys wish to cross-examine her regarding any potential bias, that is, whether she testified in order to obtain some kind of benefit for her brother. Although Mackey was made available as a witness, neither defense counsel chose to question her further.

Black was thoroughly cross-examined by defense counsel concerning his conversations with the district attorney's office and the consideration he received for his cooperation. Black maintained that he "ain't got no [*sic*] deal going" and that he had been given no promises of a reduced sentence. According to Black, all he got in return for his cooperation was that the police promised to appear at his parole board hearing. Black acknowledged that some money was paid into the jail commissary and that he had discussed receiving some of the reward money from CrimeStoppers, but he insisted that his motivation was not the money.

Finally, defense counsel called ADA Brilbeck, the prosecutor, and questioned him about the circumstances of Black's cooperation. ADA Brilbeck's testimony, in sum and substance, confirmed what he and ADA Rizzo earlier had told the court and defense counsel about how Black came to cooperate with the police.

The jury returned a verdict convicting Tirado and Concepcion of second degree murder as charged in the indictment. Tirado was sentenced to 25 years to life imprisonment.

On direct appeal, the Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed his conviction on June 18, 1999. *People v. Tirado*, 262 A.D.2d 1062 (4th Dept. 1999) (adopting memorandum decision and order as stated in *People v. Concepcion*, 262 A.D.2d 1058 (4th Dept. 1999)). The New York Court of Appeals denied leave to appeal on November 30, 1999. *People v. Tirado*, 94 N.Y.2d 830 (1999). Tirado filed three collateral motions to vacate the judgment pursuant to New York Criminal Procedure Law § 440.10, all of which were denied.

This habeas petition followed in which Tirado raises numerous grounds for relief. For the reasons set forth below, the petition is denied.

## DISCUSSION

### Exhaustion and Procedural Default

Respondent makes several arguments purporting to assert that a number of Tirado's claims are unexhausted, procedurally defaulted, or both. In the main, however, respondent's arguments either are plainly wrong or incomprehensible. For instance, respondent asserts that certain claims are unexhausted but then offers to waive the non-exhaustion defense should the Court find the claims to be without merit. This is not how one properly asserts an affirmative defense; respondent cannot "have its cake and eat it, too."  The foregoing is but one example of the fundamental misapprehension of habeas corpus jurisprudence under which respondent labors. Unfortunately, respondent's brief provides the court with no meaningful assistance as to whether Tirado's claims are unexhausted or procedurally defaulted. In any event, after its review of the record, the Court finds that resolution of the issues of procedural default and exhaustion would be time-consuming and complex, while Tirado's habeas claims may more readily be disposed of on substantive grounds. Therefore, in the interest of judicial economy, the Court will proceed to consider the merits of Tirado's claims.

### Merits of the Petition

### Ground 1:     Failure to order adjournment of trial

Tirado claims that the trial court erred violated his due process right to present evidence when it failed to grant an additional continuance in order to allow witness Sandra Barron to testify at trial and failed to make alternative arrangements to procure her testimony.

The Constitution guarantees a criminal defendant has the right "to have compulsory process for obtaining witnesses in his favor." U.S. CONST. amend. VI. The right to compulsory

process is violated when the prosecution "arbitrarily denies a defendant the opportunity to put on the stand a witness whose testimony would be relevant and material to his defense." *Singleton v. Lefkowitz*, 583 F.2d 618 (2d Cir. 1978), *cert. denied sub nom.*, *Abrams v. Singleton*, 440 U.S. 929 (1979) (citing *Washington v. Texas*, 388 U.S. 14, 23 (1967)). This guarantee encompasses the right to compel the attendance of witnesses favorable to one's defense, but it is not without limitations. *Id.* (citing *United States v. Taylor*, 562 F.2d 1345, 1361-62 (2d Cir.), *cert. denied*, 434 U.S. 853 (1977)). Absent some showing of what relevant, favorable, non-cumulative evidence the witness would provide if compelled to testify, it is not improper to deny a continuance. *Id.* (citing *Taylor*, 562 F.2d at 1362).

As the offer of proof, defense counsel stated that he expected Barron to testify that, at the time of the shooting, she was at home with her mother, Emma Glen; that she heard gunshots coming from outside near the mini-mart; and that she went to a second floor window to see what had happened. According to defense counsel, Barron witnessed the shooting, which she believed was done by two black males. Barron was expected to testify that she then ran outside, approached the black male who had the gun and asked, "Is that my brother?" Defense counsel indicated that Barron recalled that the shooter was wearing blue pants, a blue and white jacket, and a blue baseball cap. *See* T.1286-88.

After hearing the offer of proof, the court determined that, although it seemed as though Barron observed the shooting from a different vantage point than her mother, "the substance of what she would be testifying [about] would be the same as Miss Glen, or similar in nature to Miss Glen." T.1298. As discussed above, Glen testified that the shooting was done by two black males, and that the gunman was wearing a blue and white jacket and a dark blue baseball cap.

Thus, Tirado cannot establish that Barron would have provided non-cumulative evidence so as to warrant a further adjournment of the trial proceedings. On the facts before me, I cannot find that the trial court abused its discretion in refusing defense counsel's request for a further adjournment.

**Grounds 2 and 5:**     *Brady* **violation**

Tirado claims that the prosecutor failed to disclose impeaching evidence regarding Robert Black, one of the key witnesses for the People. Tirado avers that prior to trial, the prosecutor represented that the consideration given to Black in return for his testimony was only that the police would notify the parole board of Black's cooperation. According to Tirado, "it was subsequently learned that Mr. Black had been led to believe he would receive a sentence reduction on his current term by way of [a] C.P.L. § 440.10 motion and that the [P]eople would even consider having him released via the granting of a stay" pending his appeal. *See* Amended Petition at 8 (Docket #22). Tirado also complains that the prosecutor failed to disclose that he had promised witnesses Black and Mackey compensation for their testimony at trial.

To the extent that the prosecution knows of material evidence favorable to a criminal defendant, it has a due process obligation to disclose that evidence. *See*, *e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 431 (1995); *Brady*, 373 U.S. at 87. *Brady* matter includes not only exculpatory evidence going to the heart of the defendant's guilt or innocence, but also impeachment evidence having the potential to undermine the credibility of a significant prosecution witness. *See*, *e.g.*, *Giglio v. United States*, 405 U.S. 150, 154-55 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (A "jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence.").

Clearly, as the trial court determined, the facts surrounding Black's cooperation with the prosecution constituted potentially impeaching *Brady* material. However, Tirado's characterization of the inducements that Black received is inaccurate. Contrary to Tirado's assertions, ADA Rizzo expressly testified that he made no commitments to Black regarding the possibility of obtaining a stay. In fact, Black himself did not testify that he received any express or implied assurances that the prosecution would consider having him released by means of a stay. Furthermore, in light of both prosecutors' testimony and that of Black himself, there is no evidence that he was told that he was entitled to a sentence reduction simply because he cooperated. Rather, it appears from the record that Black was told that should he file a motion to have his sentence modified, the court hearing the application would be informed of his cooperation and could take that into account should the court be so inclined. Finally, defense counsel was apprised, prior to trial, of the fact that the police officers who coordinated Black's and Mackey's testimony were assisting them in obtaining the reward money posted by the victim's father through CrimeStoppers; defense counsel was provided with the tapes and transcripts of the telephone conversations among Black, Mackey and the police. Indeed, defense counsel used the transcripts extensively on cross-examination to call into question both Black's and Mackey's character and motivations and that of the police officers.

In sum, the circumstances of Black's cooperation were fully aired at trial. There was no withholding since defense counsel received the *Brady* material in time to make effective use of it at trial. Indeed, both defense attorneys subjected Black to withering cross-examination. Absent a withholding of impeachment material, I cannot find that there has been a *Brady* violation in this case.

**Ground 4:      Insufficiency of the evidence**

Tirado contends that there was insufficient evidence to prove that he was guilty of murder in the second degree beyond a reasonable doubt. Tirado asserts that none of the three eyewitnesses–Peterson, Bernard, and Glen–could identify Tirado as the perpetrator. Moreover, Tirado states, the eyewitnesses' recollection "are direct contradiction to the testimony of Robert Black and Rahnisha Mackey."

A habeas petitioner "challenging the sufficiency of the evidence bears a very heavy burden." *Einaugler v. Supreme Court*, 109 F.3d 836, 840 (2d Cir. 1997) (quotation marks omitted). The reviewing court must uphold a state criminal conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 319 (emphasis in original). Tirado must "rebut . . . the presumption that all factual determinations made by the state court were correct." *Ponnapula v. Spitzer*, 297 F.3d 172, 176 (2d Cir. 2002); *see also* 28 U.S.C. § 2254(e)(1). In making this assessment, a court may not "disturb the jury's findings with respect to the witnesses' credibility."  *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989). Thus, under this rigorous standard, a Federal habeas court "'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir. 1994) (quoting *Jackson*, 443 U.S. at 326).

Black and Mackey testified to admissions allegedly made by Tirado which implicated him in the crime; neither individual, however, witnessed the actual shooting. Glen, a defense

witness, testified that the shooter was a black man; Tirado is of Hispanic descent. Bernard, also a

defense witness, described the shooter's race as "mixed," stating that he looked like "black and

white." Peterson, who testified for the prosecution, did not give a description of the shooter's

race. None of the eyewitnesses could positively identify the perpetrator.

As is so often the case, the verdict in the instant matter came down to issues of

credibility. Here, the jury chose to credit the prosecution witnesses' testimony and convict Tirado

despite the inconsistencies between their stories and the possibility that they were biased. The

jury is exclusively responsible for determining the credibility of a witness, and a habeas court

may not revisit the fact-finder's credibility determinations.  *Marshall v. Lonberger*, 459 U.S. 422,

432-35 (1983); *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993); *Simpson v.*

*Portuondo*, 2001 WL 830946, at *8 (S.D.N.Y. July 12, 2001). As a reviewing court, I may not

"'reassess the fact specific credibility judgments by juries or . . . weigh conflicting testimony.'"

*Vera v. Hanslmaier*, 928 F. Supp. 278, 284 (S.D.N.Y. 1996) (quoting *Anderson v. Senkowski*,

1992 WL 225576, at *3 (E.D.N.Y. Sept. 3, 1992)).  On collateral review, I "'must presume that

the jury resolved any questions of credibility in favor of the prosecution.'" *Id.*

Viewing the evidence and drawing all inferences in favor of the prosecution, a rational

trier of fact could have found that Tirado killed Nelson, execution-style, upon the directive of

Concepcion. The jury's decision primarily was a matter of choosing whether to believe Tirado's

version of events or to believe the version offered by the prosecution. The jury chose to believe

the prosecution's witnesses, and I cannot say, on all the evidence presented, that no rational jury

could have found guilt beyond a reasonable doubt.  *See Gruttola v. Hammock*, 639 F.2d 922, 928

(2d Cir. 1981); *see also Carromero v. Strack*, 1998 WL 849321, at *5 (S.D.N.Y. Nov. 19, 1998)

(evidence sufficient where jury credited prosecution witnesses' testimony "despite some inconsistencies between their trial testimony and prior statements to the police and to the grand jury"). This claim provides no basis for habeas relief.

**Ground 3:      Failure to give circumstantial evidence charge**

Tirado contends that, notwithstanding his admissions to the police, there was no direct evidence of his culpability for the killing of Nelson, and therefore the trial court should have issued a circumstantial evidence charge. Tirado concedes that admissions can constitute direct evidence but argues that in this case, his statements do not connect him to the shooting unless inferences are drawn, making the admissions circumstantial in nature. The Fourth Department held the trial court properly refused to give the requested "moral certainty" circumstantial evidence charge because there was direct evidence against Tirado, namely, his admissions that were overheard by Black and Mackey.

Under New York law, a circumstantial evidence jury charge is only required, at the defendant's request, when the evidence against a defendant consists solely of circumstantial evidence. *See*, *e.g.*, *People v. Daddona*, 81 N.Y.2d 990, 992 (1993) ("Whenever a case relies wholly on circumstantial evidence to establish all elements of the charge, the jury should be instructed, in substance, that the evidence must establish guilt to a moral certainty. However, where a charge is supported with both circumstantial and direct evidence, the court need not so charge the jury.") (citations omitted); *People v. Roldan*, 211 A.D.2d 366, 370 (1st Dept. 1995) (holding that where direct evidence of conduct is presented, wholly circumstantial evidence of intent does not "trigger the necessity for a circumstantial evidence charge"), *aff'd*, 88 N.Y.2d 826 (1996).

-14-

On Federal habeas review, Tirado must shoulder a difficult burden with respect to his claim that the trial court erred in failing to give a circumstantial evidence charge. First of all, it appears that under State law, Tirado was not entitled to a circumstantial evidence charge because the evidence against him was not wholly circumstantial:  As the trial court found, the admissions by Tirado that were described by Black and Mackey were direct evidence of guilt. For instance, Black had been present with Tirado and Concepcion when Nelson was targeted to be shot; he later overheard Concepcion tell Tirado, who was dressed in black and carrying a loaded gun, to "Get him . . . get him all in the head." When Tirado returned, he stated that he "got him." *See*, *e.g.*, *Avincola v. Stinson*, 60 F. Supp.2d 133, 149 (S.D.N.Y. 1999) (finding that petitioner's admission to a co-defendant that he had just killed the victim constituted direct evidence of the murder; therefore, the case against petitioner was not "wholly circumstantial," and no circumstantial evidence jury charge was necessary); *Trail v. Kelly*, 1994 WL 389059, at *1 (S.D.N.Y. July 25, 2994) (where the "circumstantial evidence" consisted of testimony by witness that, immediately following the fatal gun shot, she saw petitioner holding the gun that fired the shot, and there was no one else present, the appellate court's conclusion that this constituted direct evidence was not unreasonable); *People v. Guidice*, 83 N.Y.2d 630, 636 (1994) (no circumstantial evidence charge necessary based on defendant's statements relevant to his guilt; "[a] defendant's statement is considered direct evidence if it constitutes 'a relevant admission of guilt'"); *People v. Reed*, 247 A.D.2d 900, 668 N.Y.S.2d 858, 859 (4th Dept. 1998) (finding no entitlement to circumstantial evidence charge where defendant's admission constituted direct evidence of crime charged).

Furthermore, the Supreme Court has noted that "[a]n omission, or an incomplete

instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). Even if the failure to give a circumstantial evidence charge was erroneous, petition must establish that the omission"'so infected the entire trial that the resulting conviction violate[d] due process.'" *Blazic v. Henderson*, 900 F.2d 534, 543 (2d Cir. 1990) (quoting *Cupp v. Naughton*, 414 U.S. 141, 147 (1973) (alteration in original). Such is not the case here. Accordingly, Tirado's claims for relief on the ground that the jury charge was erroneous must be denied.

**Ground 6:      Failure to maintain chain of custody**

Tirado argues that the prosecution failed to establish a proper chain of custody for the two plastic cups containing the projectiles removed from the victim's body. According to Tirado, Investigator Stenclik testified that he received the evidence from Investigator Campbell, who did not testify at trial. Investigator Campbell's failure to testify, Tirado contends, establishes that there was a break in the chain of custody.

Tirado's chain of custody argument presents a question of State evidentiary law that generally is  not amenable to habeas review. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Under New York law, "failure to establish a chain of custody may be excused 'where the circumstances provide reasonable assurances of the identity and unchanged condition' of the evidence." *People v. Julian*, 41 N.Y.2d 340 (1977) (quoting *Amaro v. City of New York*, 40 N.Y.2d 30 (1976)). Furthermore, both Federal and State law clearly hold that a defect in the chain of custody goes to the weight of the evidence, not its admissibility. *Cassell v. Ricks*, 2001 WL 1010977, at *7 (S.D.N.Y. July 21, 2000) (citing, *e.g.*, *United States v. Hon*, 904 F.2d 803, 810 (2d Cir.1990) ("Once the exhibits were admitted into evidence, the alleged defects in the

government's chain of custody proof were for the jury to evaluate in its consideration of the weight to be given to the evidence.")).

Even if Tirado's claim were cognizable on habeas review, it is without merit. The issue of whether the bullets in the plastic cups introduced at trial and analyzed as having been recovered from the victim's body was for the jury to decide based upon all the evidence before it. *See*, *e.g.*, *Howard v. Keane*, 1991 WL 352488, at *2 (E.D.N.Y. Dec. 9, 1991) (finding chain of custody issue not cognizable on habeas review and without merit; whether the packets introduced at petitioner's trial and analyzed as cocaine were the packets seized was a jury question). This Court finds that a reasonable jury could have concluded that the prosecution established a complete chain of custody for the bullets, or, at the very least, could have been reasonably assured of the identity and unchanged condition of them.  Therefore, this claim provides no basis for habeas relief.

**Ground 7:     Prosecutorial misconduct on summation**

Tirado asserts that the prosecutor "intentionally allowed Robert Black and Assistant District Attorney Rizzo to perjure themselves on the witness stand for the purpose of covering up the fact that Black was going to obtain a reduction of sentence for his cooperation with the prosecutor in this case and in another murder trial." Amended Petition at 8a (Docket #22). Tirado further asserts that the prosecutor bolstered Black's and ADA Rizzo's testimony by informing the jury that Black was not receiving any inducements for his testimony.

Apart for Tirado's own personal belief that Black and ADA Rizzo perjured themselves, there is no competent proof that these witnesses *actually* committed perjury. As to Tirado's claim that the prosecutor improperly bolstered Black's and ADA Rizzo's testimony, the record reveals

that the prosecutor made the following comments concerning the inducements Black received for

his cooperation:

> He [Black] thought he might be able to work something out, but as you heard as a
> sentenced prisoner his options were limited. He's doing a six to twelve year
> sentence. You heard my testimony, you heard Mr. Rizzo's testimony about what
> could[,] if anything[,] be done for him, and the answer is not much of anything.
> Doesn't sound like a deal to me. The word deal is being thrown around like
> somebody's going shopping for a car. There were no deals here. If there was it's
> one of the worst deals anybody's ever heard of. Because he ain't [*sic*] getting
> nothing.
> . . .
>
> I submit that the possibility of a letter to the parole department, I submit that the
> possibility of reward money out there, I submit the possibility if his prior
> conviction were ever opened up and he were to be resentenced to another sentence
> of four and a half to nine, speculation at best, but already, if that's out there, these
> are not motives to fabricate- -they're motives really to come forward[.]

T.810, T.1430-31.

The prosecutor merely was stating his view of the very limited inducements offered to

Black; he did not misstate the evidence regarding what Black received or reasonably could have

expected to receive in exchange for his cooperation. Although prosecutors are directed to refrain

from vouching for their witnesses' credibility, here the prosecutor prefaced his comments with "I

submit." Furthermore, the judge carefully instructed the jury that the statements of the attorneys

on summation did not constitute evidence. On record before me, I can find no constitutional

violation in the prosecutor's remarks. This claim accordingly provides no basis for habeas relief.

**Ground 9:     Failure to give jury instruction regarding accomplice status of Black and
                Mackey**

Tirado claims that the trial court failed to instruct the jury that it was required to decide

whether Black and Mackey were accomplices to the Nelson murder. Contrary to Tirado's

assertion, the trial court gave a thorough and correct jury charge regarding the definition of an "accomplice" and noted that the law views accomplice testimony with suspicion, especially when the accomplice has been promised some consideration in exchange for his or her testimony. Thus, there is no factual or legal basis for this claim.

**Grounds 10 and 12:  Newly discovered evidence**

On or about June 26, 2001, Tirado and Concepcion submitted a joint motion to vacate the judgment against them pursuant to C.P.L. § 440.10 on the basis that prosecution witness Robert Black perjured himself at their trial. The defendants submitted two affidavits by Black in which Black allegedly recanted his testimony. The first affidavit, dated June 23, 1997, only mentions Concepcion. In the second affidavit (the Court's copy of which is incomplete and missing a signature page),[4] Black allegedly states that he was "threatened by law enforcement; coerced to testify by law enforcement; given promises of a re-sentence on a prior felony narcotics conviction by law enforcement and prosecution; and given promises by law enforcement of a payment of $6,500.00 to testify. [*sic*] All for the purpose of fabricating a story against defendant Roberto Concepcion." The affidavit details, line by line, all of the testimony that allegedly was fabricated.

When the prosecution responded to the C.P.L. § 440.10 motion, it noted that this "newly discovered evidence" was not presented to the court until 2001--*four years* after Black allgedly recanted his testimony in 1997. Furthermore, Black's recantation came after he had received a modification to his prison sentence following a successful C.P.L. § 440.20 motion and had

---

[4] The Court is troubled that its copy of Concepcion's affidavit is incomplete. However, because the Court finds that the circumstances under which the affidavits were made renders them unworthy of credence, *see infra*, this omission is not critical to its decision. In the future, respondent is directed to carefully review the exhibits it submits in connection with its answers to habeas corpus petitions and ascertain that they are complete.

served out his prison time. As the prosecution stated, it is highly suspicious that Black's

"recantation" came at a time when he had already received the benefit from testifying against

Tirado and Concepcion[5] and had nothing to lose. Finally, Black's sister, Rahnisha Mackey, did

not similarly recant her testimony, despite the attempts by Concepcion's attorney to have her sign

an affidavit for that purpose. The trial court summarily denied Concepcion and Tirado's motion

to vacate the judgment for "the reasons stated" in the prosecution's answering affirmation.

Motions for a new trial based upon newly discovered evidence are "granted only with

great caution in the most extraordinary circumstances." *United States v. DiPaolo*, 835 F.2d 46,

49 (2d Cir. 1987) (internal citations and quotations omitted). Courts are particularly reluctant to

grant new trial motions where the newly discovered evidence consists of a witness recantation as

such recantations are "'looked upon with the utmost suspicion.'" *United States v. Gallego*, 191

F.3d 156, 166 (2d Cir. 1999) (quoting *United States v. DiPaolo*, 835 F.2d at 49 (citations

omitted)). Tellingly, Black never recanted his trial testimony to the district attorney or to the

police. The sole proof of the alleged "recantation" is the uncorroborated affidavit submitted by

Black, an arguably biased witness (he was friends with both Concepcion and Tirado). I am

unable to find that Black's uncorroborated affidavit, standing alone, suffices to establish that a

recantation actually occurred, let alone that Black's statements are credible.

As fully explored by defense counsel at trial, Black was offered the potential for a

reduced sentence if he cooperated with the police and provided truthful testimony at Tirado's

trial. Tirado offers no evidence apart from the uncorroborated statements by Black that the police

---

[5] Presumably, the motion court that heard Black's C.P.L. § 440.20 motion was informed of his cooperation
in the Tirado/Concepcion trial.

coerced Black into testifying against Tirado and Concepcion. Moreover, Black's affidavit, signed *after* he had received a modification in his sentence and completed his prison terms, is inherently unworthy of belief.

Even if I were to accept Black's "recantation" as true, it does not constitute newly discovered evidence sufficient to warrant a new trial. A claim "'based on newly discovered evidence ha[s] never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.'" *Ortega v. Duncan*, 333 F.3d 102, 108 (2d Cir. 2003) (quoting *Herrera v. Collins*, 506 U.S. 390, 400 (1993) (in turn citing *Townsend v. Sain*, 372 U.S. 293, 317 (1963), for the proposition that evidence that could not have been presented in the state proceedings "must bear upon the constitutionality of the applicant's detention")); *see also United States v. Bagley*, 473 U.S. 667, 678 (1985) ("[C]onstitutional error occurs . . . only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial.").

The Second Circuit has stated that "[o]nly recantations of material testimony that would most likely affect the verdict rise to the level of a due process violation, if a state, alerted to the recantation, leaves the conviction in place." *Sanders v. Sullivan*, 863 F.2d 218, 225 (2d Cir. 1988); *accord Ortega v. Duncan*, 333 F3d at 108.  Even accepting Black's allegations as true, which this Court explicitly does not find to be the case, they would not necessarily have resulted in Tirado's acquittal: the jury could have convicted Tirado based upon Rahnisha Mackey's testimony—which has not been assailed by allegations of perjury.

In sum, Tirado's claim based on newly discovered evidence of alleged prosecution witness perjury is without merit and affords no basis for habeas relief.

**Ground 11:    Ineffective assistance of trial counsel**

Tirado claims that he was "indicted as John Doe, when there appears to be no valid reason why the indictment did not contain petitioner's name on it causing it to be fatally defective." Tirado faults defense counsel for failing to move to dismiss the indictment and for consenting to the prosecution's request to amend the indictment. *See* Amended Petition at 8c (Docket #22).

I note that this claim only presents an issue of State law which generally is not cognizable on habeas review. *See*, *e.g.*, *Einaugler v. Supreme Court of the State of New York*, 109 F.3d 836, 842 (2d Cir. 1997) (It is clearly established that a Federal habeas court "may only overturn a state conviction when that conviction was obtained in violation of a Federal constitutional right.").   In any event, there was no error in the court's permitting the prosecution to amend the indictment under State law and, consequently, no attorney error in failing to oppose the amendment.

Tirado's indictment had been sealed prior to his arraignment because he never was charged in local criminal court prior to the matter being presented to the grand jury; the name "John Doe" was used to protect his anonymity. The prosecution was entitled to amend the indictment to specify Tirado's proper name since the amendment conformed to the proof before the grand jury and did not prejudice the defendant. *See* N.Y. Crim. Proc. Law § 200.70(1); *cf.* *People v. Ganett*, 68 A.D.2d 81, 84 (4th Dept. 1979) (where defendant is indicted under a fictitious name because his true name is unknown or where some person other than the intended defendant is accused in the indictment, the indictment may be amended upon discovery of the true name of the person the grand jury intended to indict), *aff'd*, 51 N.Y.2d 991 (1980).  Because defense counsel had no colorable basis upon which he could have moved to dismiss the

indictment, *see* N.Y. Crim. Proc. Law § 210.25(1), he was not ineffective in failing to do so. This claim accordingly provides no basis for habeas relief.

## CONCLUSION

For the reasons stated above, Miguel Tirado's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed.  Because Tirado has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:       May 03, 2005
             Rochester, New York.